Filed 6/5/15  Collins v. Cisterra Partners CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROY B. COLLINS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CISTERRA PARTNERS, LLC, et al.,<br><br>    Defendants and Respondents. | D066349<br><br><br><br><br>(Super. Ct. No. 37-2009-00100563-<br> CU-FR-CTL) |

APPEAL from a judgment and order of the Superior Court of San Diego County, John S. Meyer, Judge.  Reversed with directions.

Higgs, Fletcher & Mack and John Morris for Plaintiff and Appellant.

Law Offices of Martin N. Buchanan and Martin N. Buchanan for Defendants and Respondents Cisterra Partners, LLC, Steven Black and Todd Anson.

Kirby, Noonan, Lance & Hoge, Michael L. Kirby and Ryan S. Kirby for Defendant and Respondent Cisterra Partners, LLC.

Wingert, Grebing, Brubaker & Juskie and Alan K. Brubaker for Defendants and Respondents Steven Black and Todd Anson.

Plaintiff and appellant Roy B. Collins sued defendant and respondent Cisterra Partners, LLC (Cisterra), a former business associate, and its principals, defendants and respondents Steven Black (Black), and Todd Anson (Anson; together sometimes referred to as Respondents), for restitution and damages over the legal status, ownership and assets of their alleged joint venture, Nobel Research Park, LLC (NRP). At jury trial, Collins received a verdict awarding him more than $3.5 million for unjust enrichment from Cisterra. However, the trial court granted a directed verdict to set aside the jury's findings, also granting nonsuits as to Black and Anson. Collins appeals the resulting judgment.

The trial court's directed verdict was based on a reserved issue concerning extrinsic evidence received at trial on the interpretation of two settlement agreements and releases that Collins executed in 2001, arising out of underlying litigation among these parties and others over a failed contract involving Cisterra and its joint venture with Collins, which sought to buy San Dieguito Partnership's (SDP) real property (the "Nobel Property").[1] In its directed verdict ruling, the court made findings that the 2001 settlement agreements and releases that Collins signed were not ambiguous in their terms, and they operated to bar Collins's current claims to a share of monies that Cisterra received in another related lawsuit, Cisterra's claim against The Irvine Co. (Irvine) for

_____

[1] *Cisterra v. San Dieguito Partnership* (Super. Ct. San Diego County, 2000, No. GIC 746055) (the SDP underlying litigation). Collins was a cross-defendant in that litigation.

2

interference with the SDP property sale contract.[2]  Cisterra had individually sued Irvine

in 2002, and it later amended the pleadings to add, then dismiss, NRP as its fellow

plaintiff.  Following that 2006 trial, Cisterra recovered a large jury verdict against Irvine,

and in 2009, Cisterra received settlement proceeds from Irvine ($25 million gross, $13.6

million net).

Collins's current claims for restitution and damages against Cisterra seek recovery

of a one-third share of such proceeds, based on his theory of joint venture entitlement to

participation in the business and to Cisterra's full disclosures in the performance of its

fiduciary duties.  The main issues on appeal are whether the two settlement agreements

and releases (the Mar. 2001 release and the Nov. 2001 release, or the "2001 releases") are

wholly unambiguous, as the trial court provisionally found, before it went on to admit

certain extrinsic evidence for interpretation of those documents.  (*Winet v. Price* (1992)

4 Cal.App.4th 1159, 1168 (*Winet*) [court shall consider the object, nature and subject

matter of the writing, and place itself in the same situation as the parties were in at the

time of contracting]; *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69

Cal.2d 33, 40 (*Pacific Gas & E. Co.*).)

In our de novo review of the contractual language, we disagree with the trial court

that the 2001 releases are unambiguous.  Moreover, since the record contains essential

extrinsic evidence that was presented and admitted at trial, about the apparent intentions

of the parties, we determine as a matter of law that the releases, viewed in that light, do

---

[2]     *Cisterra v. The Irvine Co.* (Super. Ct. San Diego County, 2002, No. GIC 783959)
(the Irvine litigation).  Irvine is not a party here.

3

not bar the current action. The trial court did not have an adequate basis to set aside the special verdict on its interpretation of the 2001 releases.

We are next required to address the viability of the special verdict for unjust enrichment restitution, in light of the other theories presented to the jury, breach of fiduciary duty and constructive fraud. (*Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51.) We conclude the verdict is adequately supported on the theories presented and by the evidence in this trial record. We need not resolve Collins's arguments regarding fraudulent inducement of the releases. We reverse the judgment and order directing a defense verdict and remand the matter with directions to the trial court, to enter a different order that denies the motion for a directed verdict, reinstates the jury verdict, and allows appropriate further proceedings as anticipated by the nonsuit conditionally granted in favor of the individual respondents Black and Anson.

I

*BACKGROUND*

This Court previously decided Collins's appeal from an anti-SLAPP ruling, and reversed the judgment dismissing the complaint, remanding for trial. (*Collins v. Cisterra Partners, LLC* (Mar. 6, 2012, D057994) [nonpub. opn.] (our prior opn.).)[3] We take some

_____

[3] Our prior opinion reversed the dismissal of the complaint entered after Cisterra's anti-SLAPP special motion to strike was granted. (Code Civ. Proc., § 425.16.) We concluded that Collins's causes of action did not principally rely on petitioning or litigation activity (the 2001 releases or a 2006 stipulation in the Irvine litigation), but rather, Collins had sufficiently alleged underlying facts in support of his substantive claims of breach of fiduciary duty, fraud and entitlement to damages and restitution.

4

of the factual background from our prior opinion, and then set forth relevant portions of the record of the current trial and postverdict proceedings.

### A.  Underlying SDP and Irvine Litigation

In 1999 or 2000, SDP, a limited partnership (not a party to this action) owned the Nobel Property.  SDP was managed by Collins and his personal company.[4]  Collins wanted to participate in buying the property, together with Respondents, in a joint venture to be called NRP.  Collins's claims stem from a 1999 oral agreement with Cisterra to form the joint venture and its operating entity, intended to develop and sell the Nobel Property.  In October 1999, Collins prepared a purchase proposal and presented it to the board of SDP's general partner (of which he was president, although he abstained from voting).  He or his company anticipated receiving a commission as an independent contractor, and Cisterra was also to receive a fee.

Collins claims the oral agreement provided that until the NRP formation was documented, Cisterra would act as its alter ego for carrying out its business.  Collins understood from Black and Anson that once the NRP entity was formed, Cisterra would assign to it all its rights under the purchase agreement.  Collins claims he fully participated in the business of the joint venture, but in 1999, during the ongoing transactions, Cisterra allegedly secretly filed articles of incorporation for NRP as a limited liability company.  In 2000, Collins was sent and rejected a proposed operating

---

4      Collins was the president and a director of San Dieguito Valley, Inc. (SDVI), a company which served as the general partner of SDP.  Collins's affiliated company, Roy B. Collins, Inc., was formerly a plaintiff, but there were no separate issues about his company, and thus Collins proceeded as the sole plaintiff.

agreement. He claims that at some point, he was wrongfully excluded from the joint venture when Respondents breached their oral agreement and fiduciary duties.

SDP, through its managing board, conditionally approved the purchase proposal, including Collins's participation as a buyer (with formal approval Jan. 21, 2000, and execution of purchase agreement documents Mar. 5, 2000). Collins, Black, and Anson each paid one third of the $250,000 earnest money deposit for the purchase agreement, and one third of the $600,000 required for purchasing an assignment of the rights of first refusal that were held by some of the SDP limited partner/owners (the Greggs, not parties here).

The purchase efforts failed for several reasons. A disputed condition of approval was the resolution of the SDP partners' rights of first refusal, not only the Greggs but also Mary Paci (advised by her brother William Revelle; not parties here). The purchase agreement was canceled upon SDP's decision that there were ineffective assignment of the rights of first refusal. Although Irvine continued to try to buy the Nobel property, eventually, it was sold to a different buyer (IDEC).

Cisterra filed the underlying action against the Greggs as holders of first refusal rights, and amended it to add defendant SDP as the seller, and also Paci and Revelle. The Greggs filed a cross-complaint, naming Collins, among others, as a cross-defendant. Collins obtained his own counsel (Attorney William M. Benjamin). Cisterra sought and obtained Collins's agreement to bring in Irvine as a Doe defendant. However, after motion practice and an appellate writ of mandate proceeding, SDP settled with and paid Cisterra $3.2 million (so it could sell to IDEC). Irvine was not a part of that settlement.

6

In March 2001, the first of the two releases was reached between SDP, SDVI, Paci, Revelle, and Collins (the "SDP group"), and Cisterra. In relevant part, the March 2001 release text mentioned remaining, prospective claims against Irvine, by "carving out" the disputes with Irvine for future resolution. Other disputes with the Greggs (regarding their right of first refusal) were also "carved out."

Next, Cisterra settled with the Greggs over the money paid to them for their rights of first refusal. The November 2001 release resolved Cisterra's dispute with Collins over the proper reimbursement of the $200,000 Cisterra and Collins paid to the Greggs. The release further referred to release of claims arising out of "any other prior dealings between Cisterra and Collins." (See pt. B, *post*, for additional text of the releases.)

In 2002, Cisterra filed its separate litigation against Irvine. Cisterra's consultant had used some of Collins's information in 2000, to prepare an informational package to present to proposed financial partners, such as Irvine, subject to a confidentiality agreement with Cisterra. Its action against Irvine sought damages for interference with the SDP contract, claiming Irvine had breached that confidentiality agreement. In a 2005 amended complaint, NRP was added as a provisional plaintiff, due to ongoing questions about which party should have standing to obtain lost profits against Irvine, pursuant to the Cisterra-Irvine confidentiality agreement. The resolution of the standing issue in the Irvine action involved Cisterra and Irvine stipulating in October 2006 to dismiss NRP as a coplaintiff.

In October 2006, Collins testified as a witness during the Irvine action, and he claims he did not learn until that time that Cisterra had utilized his materials in

7

approaching Irvine, confidentially. When he reviewed the Irvine litigation files in 2007, he allegedly discovered the basis for his current action (to recover one third of the surviving NRP assets from Cisterra, which had litigated all of NRP's interests against Irvine). Ultimately, Irvine paid Cisterra $25 million in settlement (after sustaining a $37.5 million verdict for lost profits) to Cisterra, over their dispute. Cisterra's net recovery was $13.6 million, after expenses.

B. Text of 2001 Releases; Current Trial

Following remand from our prior opinion and a grant of a mistrial, the matter went to this jury. Cisterra was effectively the sole defendant, as the trial court granted a nonsuit as to its individual members Black and Anson. However, the trial court expressly reserved any alter ego issues about them for posttrial proceedings.[5]

Of Collins's original six causes of action, three were sent to this jury: constructive fraud, breach of fiduciary duty and unjust enrichment. Collins based his claims on Cisterra's alleged breaches of its fiduciary duties to him, as a joint venturer, and on its fraudulent concealment of relevant facts regarding the entry into the confidentiality agreement that was integral to the Cisterra-Irvine transactions. Collins sought to recover damages or restitution in the amount of approximately $4.5 million, representing a one-

---

[5] The trial court never reached the alter ego issues concerning Black and Anson, and we do not address them here, except in our directions to the trial court after reversal (pt. V, *post*).

third share of the Irvine settlement proceeds (after legal expenses), on an unjust enrichment theory.[6]

Collins contended that as joint venturers, he and Cisterra were not adverse in interest while the SDP sales effort was still going on. Later, when Cisterra returned a portion of Collins's funds to him (advanced to the Greggs; less litigation expenses), pursuant to the settlements, Collins claims it wrongfully withheld from him some additional recovery. He sought redress under his "fraudulent inducement" theory.

At trial, Cisterra filed motions in limine raising the 2001 releases as a bar to the claims. In the March 2001 release, the operative language is:

> "SDP, SDVI, Revelle, Paci, and Collins . . . hereby fully and forever RELEASE and DISCHARGE Cisterra, and its . . . principals (including Steve Black and Todd Anson) . . . from all claims, actions, causes of action, demands, indemnity, contribution, suits, debts, sums, accounts, controversies, rights, damages, awards . . . expenses and liabilities whatsoever (contingent, accrued, matured . . . discovered, undiscovered, inchoate or otherwise) which Cisterra[7] may now have, have had, or which may hereafter accrue, individually, collectively or otherwise, in connection with, relating to, or arising out of (a) the Action [Cisterra's SDP litigation], (b) the Purchase Agreement [for the Nobel Property] or (c) the Nobel Property, *except that the Parties in no way release or discharge the Greggs or the Irvine Company*." (Italics added.)

---

6  NRP projections were that it would keep 40 percent of any profits, while its financial partners would get the rest. At trial, Collins testified that his one-third share of the NRP sales proceeds was going to be reduced by a 25 percent share that he granted to SDP at the time of the transactions. (See pt. V, *post*.)

7  Strangely, this part of the release by the SDP Group purports to release any claims that Cisterra may have. The parties dispute whether this was merely a typographical error or if it is an ambiguity in the release, as we will discuss in part III.A, *post*.

The March 2001 release further stated: "Cisterra and Collins are not discharging or releasing each other regarding the claims by the Greggs, Cisterra or Collins pertaining to the purchase of the assignment agreement or the $600,000 paid to the Greggs by Cisterra, of which Collins paid $200,000." The release also included a mutual waiver of rights under Civil Code[8] section 1542, by which the parties agreed to waive claims they did not yet know or suspect to exist.

Next, the November 2001 release with Collins refers to the remaining "Dispute" as the differences between Collins and Cisterra "relating to their respective rights and obligations arising out of Cisterra's purchase of certain real property and a related assignment of a right of first refusal from [the Greggs] to Cisterra in connection with that purchase." To reimburse Collins for his share, the agreement stated that Cisterra would pay Collins $140,000 of the disputed funds, and the parties mutually released all claims against one another, as follows:

> "Collins hereby generally releases Cisterra, and all of its members, including [Black and Anson] . . . from all claims, whether past, present, or future, for all liability for damages or other relief arising directly or indirectly from, related to, or sustained by reason of any of the above-referenced Dispute *and any other prior dealings between Cisterra and Collins*." (Italics added.)

The November 2001 release included a mutual waiver of rights under section 1542, for waiver of claims the parties did not yet know or suspect to exist. Collins was represented by his attorney, Benjamin, in negotiating and executing both releases, and they each signed the releases.

---

8     All further statutory references are to the Civil Code unless noted.

C. Reserved Issues, Verdict, Directed Verdict and Judgment

At the outset of trial, the court made in limine rulings that neither of the 2001 releases contained ambiguous language. The trial court heard argument and reserved those interpretation issues for resolution at the conclusion of trial, in light of the evidence to be presented. As relevant here, the court ruled in limine to exclude evidence about the 2006 stipulation Cisterra (as a plaintiff) had reached in the Irvine litigation, to dismiss NRP as a fellow plaintiff from the litigation, for lack of standing. (Evid. Code, § 352 [as cumulative and confusing]; see *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 228-230.) The court reiterated this ruling on ambiguity when it excluded Collins's answer to a question about whether he thought the releases were supposed to cover any assignment he had made to Cisterra, of a one-third NRP interest.

Another in limine motion was granted concerning the disputed $30,000 additional amount of reimbursement Collins was seeking, for his contribution to the $200,000 payment made to the Greggs by Cisterra, in return for their right of first refusal (granted on litigation privilege grounds).

After testimony from Collins, Black, Anson, and others, the jury was instructed on Collins's remaining theories of recovery, constructive fraud, breach of fiduciary duty and unjust enrichment.[9] The jury was told it could award damages, if any, on only one

---

[9] Due to various rulings by the trial court, Collins was not able to include his fraudulent inducement cause of action for damages in closing argument. However, he claims on appeal he never abandoned his "defensive argument" that the releases did not apply because they were obtained by Cisterra's fraud. (See pt. V, *post*.)

11

theory of recovery.  (CACI No. 3934.)  The special verdict form included all three theories advanced.

After deliberations, the jury returned a verdict finding that Cisterra had breached its ongoing fiduciary duties in the joint venture, even though the venture terminated on April 5, 2000 (after SDP rejected the purchase contract).  Although Collins also breached his own fiduciary duties to Cisterra during the SDP sales transaction, he did not do so during the Irvine action, nor did his actions contribute to his own harm, nor had he waived his claims against Cisterra or acted with unclean hands.  With regard to a limitations defense, the jury found that Collins did not know of his claims against Irvine as of October 12, 2006.  The jury left blank the constructive fraud portions of the verdict. (The instructions said they could use only one theory of recovery.)  Cisterra was then found to have been unjustly enriched by having received financial benefits at Collins's expense, out of the Irvine action, and the jury verdict awarded Collins $3,544,455 as restitution owed to him.

The trial court then revisited the legal rulings it had made, but reserved, on the interpretation of the 2001 releases, and stated that the evidence did not demonstrate that they were ambiguous in any way.  The court ruled that the 2001 releases barred this entire litigation, thus mooting the jury's verdict.  It accordingly directed a verdict and entered judgment for Cisterra.[10]  On May 29, 2014, the court entered a final judgment in

_____

[10]    Cisterra has separately appealed the trial court's denial of its request for attorney fees under the prevailing party provisions of the releases.  (*Collins v. Cisterra Partners, LLC*, D066950 (appeal pending, filed Nov. 12, 2014).)  We denied a motion to consolidate that appeal with the current appeal.

12

favor of Respondents, based on its interpretation of the releases as controlling. Collins appeals.

## II

## *ISSUES PRESENTED AND APPLICABLE STANDARDS*

Collins appeals the judgment in favor of Cisterra, arguing the trial court erred as a matter of law when interpreting the 2001 releases as unambiguous, and when excluding extrinsic evidence that would have further illuminated the intent of the parties in executing them. He seeks de novo review of these issues of law. (*Winet, supra*, 4 Cal.App.4th at pp. 1165-1166.)

Collins alternatively claims his agreements to sign the releases were induced by fraud, and there was evidentiary error in excluding evidence supporting that theory (e.g., the 2006 stipulation to dismiss NRP as a plaintiff in the Irvine litigation, and the larger amount of payments Cisterra recovered from the Greggs). Collins seeks to have us apply an abuse of discretion standard of review in that respect. He further raises, as a backup issue, whether the trial court was justified in granting a nonsuit as to the individual Cisterra members (and in reserving alter ego issues for the postjudgment stage of the proceedings).

Cisterra, on the other hand, complains that Collins cannot properly present his arguments by citing only to evidence that supported the jury's factual findings in his favor (e.g., that Cisterra breached its joint venture fiduciary duties, while Collins did not). Cisterra takes the position that since the trial court ruled that the special verdict was

13

"rendered moot" by its posttrial ruling on the releases, this Court should view the facts in the light most favorable to that finalized version of the judgment.

Both parties address as the core issues on appeal whether the 2001 releases are ambiguous, and whether they preclude the maintenance of Collins's current action. These issues revolve around whether the NRP rights asserted by Collins in the current action are distinct from his released claims in the SDP litigation, and whether his NRP entitlements had already accrued as of the time of the 2001 releases. The secondary issues on appeal address the viability of the special verdict rendered on the theory of unjust enrichment, in light of the limited nature of the other causes of action pursued to verdict, breach of fiduciary duty and constructive fraud.

We first address the ambiguity arguments and the claims regarding the admissibility of extrinsic evidence, together with the proper effect of that evidence. We review the record under the analytic framework set forth in *Winet, supra*, 4 Cal.App.4th 1159, 1165-1166. Our threshold determination must be whether, on de novo review, the provisions in the 2001 releases are facially ambiguous. (*Ibid.*) For several reasons, we find they are. (Pt. III, *post.*)

Where such ambiguity of the terms of contractual releases exists, extrinsic evidence may be admitted to clarify those terms, where the contract language is " 'reasonably susceptible' " of the argued interpretation. (*Winet, supra*, 4 Cal.App.4th at p. 1165; *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266-1268 (*ASP Properties*).) " 'We review the agreement and the extrinsic evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation

14

depends upon credibility.  [Citation.]  If it does, we must accept any reasonable interpretation adopted by the trial court.' "  (*Id.* at pp. 1266-1267, quoting *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 21-22 (*Golden West Baseball Co.*).)  Extrinsic evidence will not be admitted to ascribe a meaning to an agreement to which it is not reasonably susceptible.  (*ASP Properties, supra* at p. 1267; *Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453.)

Our evaluation includes the object, nature and subject matter of the writings, considering the situation in which the parties found themselves at the time of contracting.  (*Winet, supra*, 4 Cal.App.4th 1159, 1168.)  The existence of a joint venture depends upon the intention of the parties, and may be implied from their conduct, and there may be conflicting evidence that gives rise to questions of fact about the duties they owe to one another.  (*Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272, 285; *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 820.)

As already explained, Collins played varying roles in the SDP purchase agreement transactions, since he was part of the NRP effort to buy the property, but he was also an officer of the general partner of the seller SDP, that was eventually sued by Cisterra.  Collins has acknowledged that there was a "dual relationship," but in his view, it was always disclosed and obvious to all.  The trial court commented that at times, Collins seemed to be trying to ride two horses (or was wearing two hats), one on behalf of the seller SDP, and one on behalf of the buyer NRP/Cisterra.

Our consideration of the context in which the releases were drawn up must include both of Collins's roles.  He likewise claims Cisterra had an "unusual (and hence

15

ambiguous) 'dual role,' " in "signing the Purchase Agreement with SDP and signing the Confidentiality Agreement with Irvine in its name alone, but really operating in both instances for the intended benefit of NRP."

We next examine the terms of the 2001 releases, both facially and in light of the record provided, to determine if they properly should have preclusive effect on Collins's claim to a third of the Irvine settlement funds, pursuant to his NRP interest.  (Pts. III, IV, *post*.)  As we will show, the current action does not fall within the scope of those releases.  In part V, *post*, we address the extent to which the record supports the jury's verdict for restitution, including the constructive fraud and fiduciary duty theories presented to it, and then dispose of the remaining nonsuit issues.

III

*THRESHOLD AMBIGUITY DETERMINATIONS:  2001 RELEASES*

A.  March 2001 Release:  Plain Language or Typographical Error?

The parties admit that an initial problem presented is the identification in the release of which entity's claims are being released:  "SDP, SDVI, Revelle, Paci, and Collins . . . hereby fully and forever RELEASE and DISCHARGE Cisterra, and its . . . principals (including Steve Black and Todd Anson) . . . from all claims, actions, causes of action . . . which *Cisterra* may now have . . . . "  (Italics added.)  In the next paragraph, Cisterra separately releases its claims against SDP et al.  Were Cisterra's own claims released twice?  When did "SDP, SDVI, Revelle, Paci, and Collins" (sometimes referred to here as the SDP group) literally release their own claims?

16

The trial court handled this issue by referring to prior rulings it had made, that this misidentification was a mere typographical error (or drafting error). Collins supplies a reply appendix containing the December 7, 2012 minute order denying a defense motion for summary judgment, referring to the March 2001 release and stating, "[T]here appears to be a typographical error in this release. The defendants [then the SDP group] and Collins could not release Cisterra's claims."

Counsel for Collins again raised the problem with the misidentified owner of the first set of released claims, during the postverdict proceedings. Cisterra responded, and the trial court agreed, that this problem was "long ago conceded" by Collins and his prior lawyers, and that Collins had "waived" any claim to the contrary. Accordingly, Cisterra argues on appeal (1) it was obviously impossible for Collins and the other SDP parties to release Cisterra for claims belonging to Cisterra, (2) since Cisterra had released its own claims in the subsequent paragraph of the release, (3) the parties must have intended to effectuate a mutual release of claims against one another. Cisterra cites to authority stating that where a word or term has clearly been used inadvertently, so that it is inconsistent with the true intentions of the parties, it will be rejected in favor of what the parties really intended. (*Heidelbaugh v. Miller* (1954) 126 Cal.App.2d 35, 38.) "If necessary to carry out the intention of a contract, words may be transposed, rejected, or supplied, to make its meaning more clear." (*Ibid.*)

Cisterra further argues that Collins has waived any appellate challenge to the trial court's waiver ruling by failing to supply a supporting record, or by more specifically challenging the "typographical error" theory in his opening brief. However, the opening

17

brief notes that the plain language of the release does not accord with the known facts, and in effect, Collins argues there was no evidence to support the trial court's conclusion that this was merely a typographical error. He has also supplied a reply appendix to give additional background on this problem, which we will discuss further.

There is another source of ambiguity on the face of the March 2001 release, although Cisterra argues it was intended to be a mutual release of all claims. In paragraph 1.6 (with the SDP group as releasing parties), the released party, Cisterra, has certain identified, itemized affiliates that expressly include NRP (among joint venturers). However, in paragraph 1.7 (with Cisterra as the releasing party), the itemized affiliates of the released parties, the SDP group, do not expressly mention NRP as being included. If this was intended to be a mutual release, it fails to apply to all the same parties.

Another source of ambiguity on the face of the March 2001 release of claims arises from the "carve out" provision as to Irvine, which the trial court referred to at the outset of trial as the 800 pound elephant (or gorilla) in the living room. Thus, any claims that were released, and any claims that arose out of "(a) the Action [against SDP and others], (b) the Purchase Agreement [for the Nobel Property] or (c) the Nobel Property," were still subject to the stated exception that "the Parties in no way release or discharge the Greggs or the Irvine Company." By that time, Irvine had already violated the confidentiality agreement that Cisterra drew up for the use of Collins's material about the Nobel Property, but it is unclear on the face of the release which party had preserved which rights of action against Irvine, such as the extent and scope of any NRP claims against Irvine.

18

The complexities of these facts and this record do not allow us to read the releases on a de novo basis as clearly prohibiting Collins from pursuing any NRP-related claims. A court interpreting a contract must view the language in light of the instrument as a whole, without using a " 'disjointed, single-paragraph, strict construction approach.' [Citation.]  If possible, the court should give effect to every provision." (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1, 12.)  We can accept that in context, the identities of the parties initially releasing their claims were meant to be the SDP group, including Collins.  (Par. 1.6 of the Mar. 2001 release.)  However, it has not clearly been shown that the typographical error theory resolves all ambiguity in the releases.  Their language suggests that some disputes about the entitlements between Collins, Cisterra and NRP, as to Irvine, were still reserved and open to interpretation as of March 2001, rather than being finally severed.  At least, this is a release of "uncertain parameters." (*Vega v. Western Employers Ins. Co.* (1985) 170 Cal.App.3d 922, 926 (*Vega*).)

The trial court properly carried out the first portion of the two-step process identified in *Winet*, of provisionally receiving "all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party." (*Winet, supra,* 4 Cal.App.4th at p. 1165.)  We agree with Cisterra that the trial court had an adequate basis to exclude Collins's offered testimony about his subjective beliefs for interpreting the releases.  (*Id.* at p. 1166, fn. 3 [not competent evidence to provide a party's undisclosed, unilateral expectations as alleged contract terms].)  An objective standard applies, in which the

outward expressions of contractual intent, not unexpressed intentions, are relevant. (*Edwards v. Comstock Ins. Co.* (1988) 205 Cal.App.3d 1164, 1169.)

Other evidence at trial, however, addressed the circumstances under which the 2001 releases were made and the carved out Irvine litigation carried out. That evidence was admitted pursuant to the second portion of the two-step process identified in *Winet*, *supra,* 4 Cal.App.4th at page 1165*:* "If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step--interpreting the contract." Even though we believe the March 2001 release is ambiguous on its face as to the identity of the releasers, this record partially clarifies that problem. However, it also shows that evidence was admitted about the intended scope and effect of the releases. As argued here, the evidence addressed the nature of the claims released, by Collins in his different capacities (SDP manager, Greggs's cross-defendant, and NRP venturer), as well as the time the claims accrued (as existing or potential claims). We can properly consider the record that was developed in the second phase of the extrinsic evidence analysis, to fully ascertain the scope of the releases. (Pt. IV, *post.*)

B. Additional Ambiguities: November 2001 Release

Paragraph 3 of the November 2001 release first identifies the subject of the agreement as the parties' respective rights and obligations arising out of the attempted purchase of the Nobel Property, and the related assignment to Cisterra of the Greggs's right of first refusal. The release defines the "Dispute" as "the differences between Cisterra and Collins," and notes that they were not fully litigated in the SDP litigation. In

20

particular, a remaining dispute was being settled about the respective entitlements to reimbursement for the money Cisterra paid to the Greggs for their right of first refusal.

In paragraph 6 of the November 2001 release, Collins released Cisterra, et al. from all claims, "whether past, present, or future, for all liability for damages or other relief arising directly or indirectly from, related to, or sustained by reason of" that dispute, as well as claims arising from "*any other prior dealings between Cisterra and Collins*." (Italics added.) The November 2001 release is silent as to the carved out claims against Irvine. They were evidently treated as still pending and could still have been part of the existing "differences between Cisterra and Collins," since the March 2001 release left them open for either party to pursue. We cannot say that the reference in this release to the "prior dealings" between Cisterra and Collins (i.e., prior to November 2001), necessarily included all the claims giving rise to the 2002-2009 Irvine lawsuit. At least, the Irvine carve out (potentially implicating NRP rights) was excluded from the prior dealings between Collins and Cisterra. Because of the status of this record, we continue to examine the extrinsic evidence as admitted, for purposes of interpretation of the terms of both releases.

IV

*INTERPRETATION AND SCOPE OF RELEASE*

At the outset of trial, the court heard Cisterra's motion in limine (No. 5) to exclude extrinsic evidence "that contradict[s] the terms of the written settlement agreements and releases executed by the parties." The court decided that the interpretation and legal effect of the releases was "a question not for the jury but for the Court." The court stated

21

parol evidence or extrinsic evidence could be presented so that the parties' intent could be determined "not only from the written expression but from the conduct and circumstances surrounding that memorialization."

The jury was told not to decide the legal effect of the releases signed by the parties, as that was a question for the court. After the jury verdict, and before entry of judgment, the court received posttrial briefing on the issue it had reserved as to the effect of the releases, and held a hearing. The court then confirmed the previous ruling that the releases were not ambiguous, and set aside the verdict. We examine the evidence to decide if the 2001 releases are properly susceptible only to that reading.

A. Circumstances About NRP's Planned Role in Transactions

On the circumstances surrounding the execution of the 2001 releases, the evidence showed all parties were represented by counsel during the SDP action and its resolution. Collins had been admitted to the bar some years previously and was a sophisticated businessman who was "riding two horses" during the transactions, both as seller and buyer. (See *Salehi v. Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1159-1160 [an attorney should have been able to understand the import of a section 1542 waiver].)

Due to Collins's position as president of SDP's general partner, it was a condition of the purchase that Collins would be approved by SDP as a participant in the project. Following that approval, he believed that Cisterra's rights as a fellow purchaser would be assigned to NRP. As part of the process, Collins contributed money to the purchase of the Greggs's right of first refusal, so that Cisterra could purchase the property.

22

However, Black anticipated that Cisterra would be buying and developing the Nobel Property, whether SDP approved the participation of Collins as a fellow buyer, or not.

In Black's testimony, he described the draft operating agreement for NRP sent to Collins, which was never approved. Black anticipated that the financial partners still to be obtained could have affected the terms of such an operating agreement for NRP, and it was never finalized.

Anson testified that as of the time of the purchase offer to SDP, he questioned Collins's loyalty to the NRP deal, because a larger purchase price from a different buyer would have given Collins a larger payout from the seller (his employer SDP).

Collins's designated status at the time of signing of the releases was cross-defendant in the Greggs's pleading, as well as an officer of SDP's managing entity. Any NRP claims are not acknowledged in the releases, except for a provision in paragraph 1.6 stating the SDP group was releasing Cisterra and its affiliate NRP, among others, from any claims "Cisterra" (really the SDP group) might have. No such additional release by Cisterra of NRP (as an affiliate of the SDP group) was made, however. NRP was not a releasing party.

B. Ambiguity: Was Collins's NRP Claim Distinct From His Released SDP Claims?

The "scope of release" has been identified as a material term of settlement agreements. (See *Kohn v. Jaymar-Ruby, Inc.* (1994) 23 Cal.App.4th 1530, 1534.) To examine whether the 2001 releases resolved the same claims as in Collins's current action, we look to the record on the different roles he was playing at the time in the SDP

23

litigation.  Because of the known dual capacity in which Collins was operating with respect to the Nobel Property, the scope of the 2001 releases must be examined for the questions of who released what, and against whom?  (For these purposes, we assume these were mutual, sequential releases of those claims arising from the identified disputes, according to the typographical error theory.)  We first discuss whether distinct claims on the part of Collins are involved.

Extrinsic evidence is admissible regarding the scope of a waiver of unknown claims, when it bears upon the intention of the parties and thus raises questions of fact. (*Butler v. The Vons Companies, Inc.* (2006) 140 Cal.App.4th 943, 949-950 (*Butler*); § 1542.)  Such evidence must be relevant to prove a meaning to which the language is "reasonably susceptible." (*Winet, supra*, 4 Cal.App.4th at p. 1165, citing *Pacific Gas & E. Co., supra*, 69 Cal.2d at p. 37.)  In *Butler*, the court found the subject release agreement, arising out of a workplace altercation and union grievance, was ambiguous on the issue of the scope of the waiver of claims in it.  The extrinsic evidence in that case clarified that the parties reasonably understood their release agreement had resolved and settled only the altercation grievance, but not the plaintiff Butler's civil suit alleging employment harassment and discrimination claims.  (Gov. Code, §12900 et seq., the Fair Employment and Housing Act (FEHA) [right to sue letter].)  The court determined that it was a triable question of fact whether the plaintiff and his employer had agreed that the scope of his section 1542 waiver extended, or did not extend, to his separate harassment and discrimination claims.  (*Butler, supra,* at pp. 949-950.)

24

In its analysis, the court in *Butler* found it persuasive that the release agreement used the terminology of grievances, and did not include any attachment referring to an intent to settle matters outside the scope of the grievance. The employee's extrinsic evidence suggested the parties had not discussed the relationship of the employment discrimination lawsuit and the settlement of the grievance. (*Butler, supra,* 140 Cal.App.4th at p. 946; *Jefferson v. Department of Youth Authority* (2002) 28 Cal.4th 299, 304.) Therefore, the intended scope of the section 1542 waiver was ambiguous and properly subject to further proof. (*Butler, supra*, at p. 951; see *Mitchell v. Union Central Life Ins. Co.* (2004) 118 Cal.App.4th 1331, 1341-1342 [factual issue identified on whether settlement of a worker's compensation claim had also released a FEHA claim].)

In *Leaf v. City of San Mateo* (1980) 104 Cal.App.3d 398, 409-410 (*Leaf*), the court identified several separate sets of primary rights that the plaintiff Leaf had asserted in two lawsuits, the first one against the sellers (fraud and nondisclosure) and the developers of his property (defective engineering and manufacture), as of the time of purchase (1972). In that first action, he settled and released those claims. (*Id.* at pp. 403-404.) However, in a different action against the defendant City of San Mateo, he later claimed inverse condemnation, continuing nuisance, and ongoing dangerous/defective conditions of public property, "which not only contributed to the property damage of which plaintiffs were previously aware, but which plaintiffs allege has independently caused them damage in the form of tripled or quadrupled cost of repair." (*Id*. at p. 410, fn. omitted.) As such, the court in *Leaf* rejected the City's claim that the release previously executed by the plaintiffs, as to the sellers and developers, must work as a prospective release as to

25

"all others," including the City, which had been sued later on different grounds. (*Ibid.*) The court stated that the release was only operative as to "all other persons connected with the transaction," and did not apply to bar "a separate and distinct cause of action against a successive, independent wrongdoer." (*Ibid.*) "[M]ere recital, as in the release signed by plaintiffs, that the protection of Civil Code section 1542 is waived, or that the release covers unknown claims or unknown parties is not controlling. Whether the releaser intended to discharge such claims or parties is ultimately a question of fact." (*Id.* at p. 411.)

In *Vega*, the court examined a release document executed in a personal injury action. Plaintiff Vega was injured in a vehicle accident, suing the other driver and vehicle owner and recovering a judgment. The then plaintiff settled with the other driver and owner and their insurer, Western, releasing all claims, known or unknown, which arose "from the accident," and waiving section 1542 protections. (*Vega, supra,* 170 Cal.App.3d at p. 924.) The issue arose whether the plaintiff's subsequent separate action against the insurer for unfair practices, claiming bad faith refusal to settle, should be barred by the release. The court did not find any reference in the release to potential liability of the insurer with respect to different theories of recovery, such as bad faith, unfair practices, or Insurance Code section 790.03. The only consideration given was for the release of the personal injury claims arising from the accident, not the bad faith claims. "Thus, we conclude the purpose for the inclusion of Western's name in the release is ambiguous and remains a factual question. [¶] Accordingly, parol evidence was and is admissible on the question of the parties' intent. And regardless of the

26

language in a form release, there are few, if any, occasions where the issue of the releaser's intent is not one of fact." (*Vega, supra*, at pp. 926-927.)

In *Sime v. Malouf* (1949) 95 Cal.App.2d 82, the court considered several factors to determine whether a release that was executed in connection with one joint venture transaction should also embrace and bar related claims that arose later (for fraud and conspiracy to defraud by other members of the venture). The court determined that the fraud claim arose in connection with a different transaction, separate from the joint venture relationship. That joint venture had been terminated when the plaintiff sold his interest in it, but he claimed defendants had failed to meet their duty to inform him of its real value. The release accordingly was limited to claims arising out of the closing of the joint venture (such as an accounting). It did not include independent allegations of fraud to induce the sale of the joint venture interest, and it could not be interpreted as a general release that would have barred claims that were then unknown to the plaintiff, which he could not have intended to release. (*Id.* at pp. 109-110.)

Here, as in *Butler, supra*, 140 Cal.App.4th 943, the release agreements do not include any attachment or reference to an intent to settle matters outside the scope of the SDP related sale dispute. In particular, the March 2001 release carves out the Irvine dispute for further litigation, but without identifying which party had which interest in pursuing the Irvine dispute, such as the NRP participants. As a cross-defendant, Collins was individually connected with the main SDP dispute, but in his NRP capacity, the matter is open to interpretation. As in *Leaf, supra*, 104 Cal.App.3d 398, the facts were disputed whether the release was operative as to NRP, as another "connected with the

27

transaction."  Where a separate and distinct cause of action against a successive, independent wrongdoer is concerned, a general release has no application or preclusive effect.  (*Id.* at p. 410.)  Arguably, the evidence here supports an inference that Cisterra, in independently pursuing the separate Irvine litigation, was doing so on behalf of NRP and wrongfully excluding Collins, and it continued to do so after the time of the release.  Whether the release covered all Collins's NRP claims remained a factual dispute.

In *Vega, supra,* 170 Cal.App.3d 922, the relevant factors included ambiguity as to the release's intended scope, with respect to the insurer's role as indemnitor for the tortfeasors, or its function in alleged tortious conduct of its business of insurance.  Here, the relevant factors include Collins's dual roles in the proposed SDP/Cisterra sales transaction.  The release is ambiguous as to the intended scope of coverage for Collins's potential claims in his role as a thwarted buyer, in view of the NRP relationship he had with Cisterra.  Cisterra also arguably was operating on several fronts, as the purchaser, or as the purchaser to hold the property on behalf of NRP (the anticipated eventual developer of the Nobel Property).  The circumstances of the parties' conduct during their relationship varied, and so does the potential nature of the claims that arose between them.

By comparison, in *San Diego Hospice v. County of San Diego* (1995) 31 Cal.App.4th 1048, this court interpreted a release between the County, which sold property to the hospice, as successfully resolving " 'all disputes that exist or hereafter could arise between them with respect to the site.' "  (*Id.* at p. 1053.)  This included releasing the County from all claims "past, present and future, known or unknown,

28

suspected or unsuspected with respect to the site." (*Ibid*.)  However, both in *San Diego Hospice* and in *Winet*, *supra,* 4 Cal.App.4th 1159, the parties stood in the same relationship to each other throughout, and there were no issues about a separately accruing claim that represented a separate entity's primary right.  (See *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1410 [under the primary rights theory, the determinative factor is the harm suffered].)  There was extrinsic evidence at trial supporting a conclusion (as found by the jury), that Collins had an actionable joint venture agreement with Cisterra, and he was harmed by it in a separate capacity from that which he fulfilled in the property transaction, concerning SDP.

In view of the known dual capacity that Collins was operating in with respect to the Nobel Property, the March 2001 carve out for the parties' pending claims against Irvine and the Greggs can be interpreted as allowing one or another or both together to pursue Irvine.  The carve out did not allocate the rights against Irvine, particularly those arising out of the joint venture NRP.  Although Collins and Cisterra were not on the same side with respect to SDP, the record does not show when they clearly and objectively terminated their relationship with respect to rights in NRP.  There were conditions on the Cisterra proposal to buy the Nobel Property, but the frustration of that proposal did not prevent the NRP joint venture from maintaining its existing status and duties, in terms of its alleged rights to have the deal assigned to it from Cisterra.

With respect to the November 2001 release regarding the prior dealings between the parties, it maintained the position that the Irvine disputes had been carved out. Collins arguably retained rights as a member of NRP to pursue Irvine, and the releases

did not define the subject dispute in a manner that would have properly prevented him from doing so in the current action.

## C. Circumstances About Timing of NRP Claims Against Irvine

With respect to the March 2001 release's carve outs of potential claims against the Greggs and Irvine, the court took into account the chronology of events as showing that "the carve out anticipated a future lawsuit against Irvine." The court explained: "[I]t would seem obvious that somebody was thinking, we're going to sue Irvine or somebody's going to sue Irvine and we want to make damn sure that . . . they don't claim, hey, this is yesterday's news, we're released . . . ." The court deferred a definitive ruling on the issue until after trial, in the meantime allowing Collins to seek to bring in parol evidence about the scope of the releases and why they should not clearly bar his claims, which he contended were separate and stemmed from the NRP interest in the Irvine action. The court told counsel for Collins, "unless you convince me that there really is an ambiguity, and I don't think there is, but maybe you can convince me that there is, in which case we get into parol evidence and kick the can down there."

Two categories of extrinsic evidence about the possible intent of the parties in the 2001 releases, with respect to any NRP remaining rights, were brought in at trial. We first outline the evidence about their conduct in 2001, then the subsequent conduct during the 2006 Irvine litigation.

### 1. 2001 Conduct

With respect to any NRP claims that might exist against Irvine, Collins had knowledge as of March 24, 2000 that the Greggs were apparently working with Irvine

30

against the Cisterra offer. Black's handwritten notes dated March 26, 2000 discuss how the Cisterra purchase was apparently going to go through anyway, despite the Irvine interference.

When Irvine kept trying to buy the property from SDP, SDP rejected its offer because SDP was not interested in indemnifying Irvine, as it demanded, for Cisterra's claims. As of February 2001, Collins and his then attorney, Benjamin, were aware that Cisterra was planning to add Irvine as a Doe defendant in the SDP action, and they did not object.

When asked at this trial if he knew Cisterra had planned to add Irvine as a Doe defendant in the SDP case, Collins said he knew of no reason to care if they did at that time. Collins's then attorney Benjamin, called as a defense witness, testified that when he represented Collins as an individual concerning the SDP action, he was given notice of a proposed modification of a protective order in the Irvine case that Cisterra was seeking. Under Benjamin's normal procedures, he would have sought his client's approval of the request and did so at the time, but he did not have any reason to discuss any potential claims Collins had against Irvine at the time.

### 2. 2006 Conduct; Ruling to Exclude 2006 Stipulation

There was a factual issue at trial on when Collins's NRP claims accrued. Cisterra was contending that the joint venture had been terminated in 2000, when SDP decided to allow another buyer to get the property. Then, only Cisterra had been able to pursue the claims against Irvine, based on the breach of its confidentiality agreement. Cisterra raised an affirmative defense at trial that this action was not filed within the time set by

31

law, and the issue was presented to the jury. It decided that Collins did not have knowledge regarding his alleged claims against Cisterra in connection with the Irvine lawsuit, before October 12, 2006.

During the in limine phase of trial, the court excluded evidence about the 2006 stipulation Cisterra (as a plaintiff) had reached in the Irvine litigation, to dismiss NRP as a fellow plaintiff from the litigation (on standing to sue grounds). Respondents provided transcripts from the Irvine trial, in which the parties were discussing their damages models and potential problems if both Cisterra and NRP were claimants. There, the trial court had remarked that any alter ego issues with respect to Cisterra and the individual defendants could be handled on a postjudgment motion basis, if required. In our case, the court ruled that evidence on legal theories such as standing was unduly confusing under Evidence Code section 352. However, the court clarified the ruling to say that Collins could still bring out the issue of the amount of the NRP share that was being sought at the Irvine trial by Cisterra (all of it).

Mainly with respect to his fraudulent inducement theory, Collins argues there was evidentiary error in excluding further references to the 2006 stipulation to dismiss NRP as a plaintiff in the Irvine litigation. He claims that when the 2001 releases were obtained, Respondents had knowledge that there might be surviving NRP claims, but such information was concealed from him. The trial court could properly have allowed extrinsic evidence about the parties' acts that occurred after the releases were finalized, if it demonstrated what their original contractual intent might have been. (See *City of Hope Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393.)

32

As summarized in our prior opinion, evidence about the 2006 stipulation was not properly characterized as merely litigation related and/or privileged activity, for purposes of analysis under the anti-SLAPP statute. (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 729-730.) We observed there, "Collins is suing mainly on claimed breaches of duty that arose earlier in the business context and that continue." We held that the anti-SLAPP motion was not well taken, because the "alleged concealments of material information, before [Respondents] presented the 2006 stipulation to the court," were not predominantly acts by Respondents of a protected petitioning character. However, our prior opinion did not make any binding litigation privilege rulings that would have required or prevented admission of this evidence. (§ 47, subd. (b).)

Now, we examine the arguments about the 2006 stipulation in terms of whether the trial court abused its discretion under Evidence Code section 352 in granting the motion to exclude that evidence. The test is whether extrinsic evidence is admissible to ascribe a meaning to an agreement to which it is reasonably susceptible. (*ASP Properties, supra,* 133 Cal.App.4th at p. 1267; *Wells Fargo Bank v. Marshall, supra,* 20 Cal.App.4th 447, 453.) We acknowledge that the way this proposed evidence was presented was highly technical and somewhat confusing, in terms of damages models in the Irvine litigation. However, in view of the factual dispute that was sent to this jury, about when Collins's NRP-based claims accrued, we think the trial court erred in prohibiting direct references to the 2006 stipulation. The NRP claims' interrelationships with the SDP disputes and the 2001 releases were vital issues to be resolved.

In any event, the court properly allowed numerous indirect references to the context in which the 2006 stipulation was reached, to shed light on one of the sources of Collins's NRP claims. In the Irvine litigation, Collins appeared as an adverse witness for both Cisterra and Irvine. Irvine's attorney at the Irvine trial, Dean Janis, testified that he interviewed Collins in preparation for the trial, and thought he would be helpful to the case against Cisterra.

During the Irvine trial, Collins took the position that he had no interest in Cisterra's proposed recovery from Irvine. When asked at this trial why he said that, he said his answer was "based on what I knew at the time." Thus, he testified in this matter that he was not aware at that time that Cisterra was suing to collect all of the damages arising from the Irvine interference with the joint venture's efforts to purchase the Nobel Property. Collins said he thought that Cisterra was only pursuing its own two-thirds interest. His later study of the Irvine trial records convinced him that Cisterra had also been asserting his own rights, and he testified that he did not ever assign away his NRP rights to one third of the lost profits to Cisterra's principals. That testimony raised no problem with the ambiguity ruling.

Next, on the issue of Collins's knowledge of any claims he, as a member of NRP, might have had against Cisterra and/or Irvine, the court sustained a defense objection when his attorney asked him whether the release, itself, was intended to assign his rights to any Irvine damages to Cisterra or its principals. However, the trial court noted Collins had already testified he did not assign any such rights to them.

34

During Anson's testimony, the court and counsel again discussed the ruling that had excluded the terms of the 2006 stipulation in the Irvine action that brought NRP in, then took it out. The court adhered to its pretrial ruling and said that Collins could bring out the issue of the amount of the NRP share that was being sought at the Irvine trial by Cisterra (all of it). Collins consistently argued that he did not realize until after the Irvine trial that Cisterra had pursued not only its two-thirds interest, but also the Collins third.

Even without the admission of more specific evidence about the 2006 stipulation regarding NRP's participation in the Irvine litigation, the record shows that Collins testified, in that context, he had a claim to one third of the Cisterra recovery, based on the NRP rights. The allowable evidence about the 2006 stipulation about NRP's stake in the Irvine action suggests its role remained in real dispute among the parties, and that after the releases were signed, Cisterra was still treating NRP as an existing entity, for some purposes.

D. Ambiguity: When Did NRP Claims Accrue Against Irvine?

In light of the above evidence, we examine the 2001 releases for whether they effectively released all unknown claims by Collins, including his NRP-based claims, in light of his participation in the SDP litigation. The protections of section 1542, unless waived, establish that a general release does not extend to claims not known or suspected to exist. (*Leaf, supra*, 104 Cal.App.3d 398, 410-411.) "[I]nadvertent" waivers of unknown claims are not established merely because the release recites that a waiver is made. (*Casey v. Proctor* (1963) 59 Cal.2d 97, 109 (*Casey*); *Winet, supra*, 4 Cal.App.4th

35

at p. 1170.)  However, such waivers may be deemed binding "upon a showing the parties consciously understood and agreed such was the effect of their release."  (*Ibid*.)

*Casey* interpreted section 1542 in the personal injury context, stating that public policy concerns "warrant special treatment of releases for personal injuries."  (*Casey, supra,* 59 Cal.2d at p. 112.)  It was deemed a question of fact whether a releasing party actually intended to discharge such claims.  (*Ibid.*)  In *Winet, supra*, 4 Cal.App.4th 1159 at pages 1170 through 1171, the court found that its business generated case was not subject to the concerns outlined in *Casey*, to the extent *Casey* restricted releases of unknown claims belonging to unsophisticated, injured claimants who were presented with form releases, on a "take it or leave it" basis.  (See, e.g., *Brae Transp., Inc. v. Coopers & Lybrand* (9th Cir. 1986) 790 F.2d 1439, 1444-1445 [declines to apply rationale of personal injury cases to commercial release].)

Cisterra argues that in this business related context, the releases are broad enough to cover and bar all potential joint venture based claims, even if unknown to Collins in 2001.  In the March 2001 release, the designated claims are said to arise out of (1) the SDP litigation, or (2) the SDP purchase agreement, which are fairly well defined contours.  With respect to (3), the claims arising out of the Nobel Property, that may well be a broader definition of the subject dispute.  In any case, the carve out provided that no parties had in any way released or discharged the Greggs or Irvine, but it did not explain whether the parties could or must be allied in pursuing them, such as through the joint venture NRP, or were going to do so separately, such as Cisterra alone as the only other

36

named party with Irvine in the confidentiality agreement (possibly to the wrongful exclusion of Collins).

Generally, an action against a fiduciary is subject to delayed accrual until there is knowledge or notice of the claims. (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 679, pp. 895-897; *Sherman v. Lloyd* (1986) 181 Cal.App.3d 693, 697-700.) Even if Collins's claims to an NRP share in the Irvine settlement proceeds accrued in 2006, when the stipulation was filed, or in 2009 when the money was received, the evidence about the circumstances of the transactions did not clearly support a reading of the releases that the NRP rights fell within the scope of the known or unknown claims that were mentioned or anticipated in the March 2001 settlement. Neither was the scope of the disputes with respect to the "prior dealings" between the parties definitively set forth in the November 2001 settlement.

The trial court's construction of the releases did not change over the trial, and it adhered to its initial ruling that the releases were not ambiguous. It does not appear that the trial court relied on conflicting evidence or credibility determinations to reach its conclusions on the lack of ambiguity. As such, it would not be appropriate for us to determine that any substantial evidence supported its construction. (*Winet, supra*, 4 Cal.App.4th at pp. 1165-1166; *Golden West Baseball Co., supra*, 25 Cal.App.4th at pp. 21-22.)

Instead, we conclude the release language is reasonably susceptible to an objective reading that the parties did not include each others' NRP roles in the releases. On the face of the March 2001 release in paragraph 1.6, only the SDP group was purported to

37

have released its claims regarding NRP, while that language was omitted from the releases made by Cisterra. The 2001 releases did not clearly settle and release any claims to NRP assets that Collins may still have had after 2001, whenever they were deemed to accrue. The proposed joint venture agreement existed independent of the purchase agreement, and the chose in action against Irvine was a partnership asset. Collins showed a cognizable interest existed in the potential for recovery from Irvine, both before 2006 when the stipulation to dismiss NRP was made, and after that, when the settlement monies were eventually recovered by Cisterra.

Here, as in *Sime, supra*, 95 Cal.App.2d 82, 109-110, the evidence supports a reading that the 2001 releases were limited to claims directly arising out of the termination of the Cisterra-SDP buyer-seller relationship. Collins did not knowingly release any NRP-based claims, based on the nature of his participation in the SDP action. The releases did not clearly cover the events that followed, in which Cisterra sought relief for Irvine's interference with that contract, and eventually gained it, but without Collins's participation.

Both upon construction of the instrument solely based on its own language, and on the competent parol evidence that was presented about the circumstances in which the releases were made, we treat the construction of them as confined to questions of law, and independently construe the writing. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) In view of the available parol evidence about the circumstances regarding the making of the agreement, " ' "including the object, nature and subject matter of the writing" ' " (*Winet, supra,* 4 Cal.App.4th at p. 1168), we conclude the 2001

38

releases cannot be reasonably read as incorporating and barring the carved out Irvine dispute, whether it was to be pursued by Cisterra on its own behalf, or on behalf of NRP, or instead by Collins as a joint venturer in NRP.

V

*UNJUST ENRICHMENT VERDICT; REMAINING ISSUES*

Our reading of the 2001 releases, on a de novo basis and in light of the trial record, leads us to conclude the trial court erred in ruling that they unambiguously barred Collins's claims against Cisterra. This conclusion does not require our consideration of the excluded evidence about Collins's subjective understanding of what the releases were supposed to cover. Moreover, there is no adequate showing that further trial proceedings are necessary on any identified questions of fact about the limited scope of the releases. It is not necessary to reach Collins's fraud in the inducement arguments.

Even though the trial court's postverdict ruling is reversible, the question remains as to whether the jury verdict is adequately supported by the record. According to Cisterra, the verdict was defective as a matter of law, because it awards unjust enrichment restitutionary relief, on findings that Cisterra's breach of fiduciary duties occurred but did not create Collins's damages. We next examine the instructions and the record to assess the support for the verdict.

A. Background

Collins argued to the jury that Cisterra and its principals remained under a fiduciary duty to honor his participation in the NRP joint venture agreement, before and after the Irvine settlement was reached. He argued that "you can't sue for somebody

39

else's money and not give it to them. You can't keep somebody else's money." Collins presented three theories of recovery to the jury, constructive fraud, breach of fiduciary duty and unjust enrichment. His counsel argued that no "enrichment" had taken place until the Irvine money was recovered in 2009.

In response, Cisterra contended the evidence showed that Collins was hostile to Cisterra in 2001, and had testified against it in 2006 in the Irvine trial, and thus he should not be claiming that the joint venture duties were ongoing, especially since he had not assisted Cisterra in pursuing Irvine. Instead, Cisterra argued the joint venture "died" in 2000, when SDP decided to allow another buyer to get the property. Cisterra objected to Collins's unjust enrichment theory, contending that it was not properly a legal issue to present to the jury.

The jury received instructions defining joint venture and the fiduciary duty owed by a joint venturer, which duty may be found to have continued in some cases, even if the purpose of the joint venture was frustrated. The jury was instructed on the elements of an actionable tortious concealment of material facts, where it was a substantial factor in causing harm to the plaintiff. On the tort damages sought but contested, the instructions stated that Collins was claiming one third of the $13.6 million net recovery from the Irvine action (approximately $4.5 million), but subject to SDP's portion. The jury was told it could only award damages, if any, on one theory of recovery. No definition of unjust enrichment was given to the jury.

In its verdict, the jury found that Cisterra had breached its fiduciary duties in the joint venture, and those duties continued even after the termination of the joint venture on

40

April 5, 2000. Although Collins was found to have breached his own fiduciary duties to Cisterra during the sales transaction, he did not do so during the Irvine action. Collins did not know of his claims against Irvine as of October 12, 2006. The jury concluded he had not waived his claims against Cisterra or acted with unclean hands.

On the damages issues, the jury found no damages for Collins had resulted from the Cisterra breach of its fiduciary duty. Cisterra was nevertheless found to have been unjustly enriched by having retained the financial benefits it received, at Collins's expense, in the Irvine action. The verdict awarded Collins $3,544,455 as the amount of restitution owed to him by Cisterra as a result of its unjust enrichment. As the recording of the verdict was reported, the jury left blank the constructive fraud portions of the verdict. This could be explained by the instruction that they could use only one theory of recovery. (CACI No. 3934 [no damages on duplicative theories].)

## B. Arguments and Legal Principles

According to Cisterra, the defense judgment should be affirmed on the grounds that the jury made only one finding in Collins's favor "on a non-existent cause of action for unjust enrichment," which it claims is a legal nullity. It cites cases such as *Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793, stating "[T]here is no cause of action in California for unjust enrichment." (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370 (*Durell*) ["[U]njust enrichment is synonymous with restitution."].)

In reply, Collins cites to cases such as *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 347, which identify unjust enrichment as "a common law

41

obligation implied by law based on the equities of a particular case and not on any contractual obligation. [Citation.] Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred 'is an obligation (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.' [Citation.]" (*Id.* at p. 346.)

"Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another. [Citation.] A person is enriched if he receives a benefit at another's expense. [Citation.] The term 'benefit' 'denotes any form of advantage.' [Citation.] Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss. Even when a person has received a benefit from another, he is required to make restitution 'only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.' [Citation.]" (*Ghirardo v. Antonioli, supra*, 14 Cal.4th 39, 51, 54-55 [damages allowed on a common count theory that was based on unjust enrichment principles].) The presence of mistake, fraud, coercion or request for the activity will often cause a receipt or retention of a benefit to be deemed unjust. (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1663; *Durell, supra*, 183 Cal.App.4th at p. 1370; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1020, p. 1109.)

A tort action for damages for fraud is considered an action at law. Where a plaintiff's money has been obtained by false representations, the plaintiff may bring an action in quasi-contract for restitution, which is a legal action. "This is so, even though

42

'equitable principles' are invoked in determining liability and the action is against a trustee or other fiduciary."  (3 Witkin, Cal. Procedure, *supra,* Actions, § 131, p. 210; *Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 695-696 (*Martin*) [form of relief sought in the complaint indicates the "gist" of the action; actions at law usually seek a money judgment for damages, while equitable actions seek some form of specific relief or equitable decree].)

Where the plaintiff's complaint presents both legal and equitable rights of action, there is a right to jury trial on the legal issues.  (*Connell v. Bowes* (1942) 19 Cal.2d 870, 871-872; *Patterson v. Insurance Co. of No. America* (1970) 6 Cal.App.3d 310, 315; 3 Witkin, Cal. Procedure, *supra*, Actions, § 135, pp. 213-215.)

## C.  Bases of Verdict; Remaining Issues

The gist of the action presented to the jury was breach of fiduciary duty, seeking damages.  (*Martin, supra*, 51 Cal.App.4th at pp. 695-696; *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101; *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182.)  Collins argued he justifiably relied on the nature of the joint venture relationship to protect his interests.  (See *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239-1240; *Lee v. Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 921.)  He also presented constructive fraud claims to the jury, on the basis that Cisterra had concealed material facts about his NRP interests from him.  (*Byrum v. Brand* (1990) 219 Cal.App.3d 926, 937-938 [constructive fraud requires a fiduciary relationship].)  In *Durell, supra*, 183 Cal.App.4th 1350, 1370, this court said a plaintiff could not properly seek recovery for unjust enrichment or restitution, where instead an enforceable express contract

43

relationship existed. However, a cause of action seeking restitution can be based on other underlying theories, such as where a contract was procured by fraud, or " 'where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct.' " (*Ibid.*)

During the postverdict proceedings, the court and counsel discussed the restitution award that the jury selected in its 10-2 vote, approximately $3.5 million. They believed that the jury must have deducted about 25 percent of the amount Collins sought, as reflective of the offset that Collins admitted in his testimony might be due to SDP, due to his original arrangements with it. Whatever the reasoning of the jury, the gist of the action presented to it was not solely an unsupported unjust enrichment theory, but rather it included companion theories of breach of fiduciary duty and constructive fraud.

The jury complied with the trial court's direction to select one of the three theories presented for its damages award, if any. It made underlying findings of breach of fiduciary duty and of reasonable reliance on representations, where other material information was concealed. The jury was allowed by the instructions and the verdict form to do what it did, and the unjust enrichment award was specified to be in the nature of restitution for the breaches of duty found. We cannot say the verdict was unsupported by the evidence, nor that it represents a legal nullity under the legal principles set forth above. In light of the inapplicability of the 2001 releases, which we have decided as a matter of law on this record, the proper procedure is to reinstate the verdict for restitution.

Finally, the nonsuit rulings as to Cisterra's principals, Black and Anson, must fall with the reversal of the order and judgment. The trial court carefully observed in

44

granting nonsuits as to those individual defendants that any alter ego issues with respect to Cisterra could be handled in postjudgment motions, if required. Without expressing any opinion on the merits of the issue, our directions to the trial court include the allowance of any appropriate further proceedings on those alter ego claims, if any.

## DISPOSITION

The judgment and order directing a defense verdict are reversed with directions to the trial court to enter a different order that denies the motion for a directed verdict and that reinstates the jury verdict, and that allows appropriate further proceedings as anticipated by the nonsuit conditionally granted in favor of the individual respondents Black and Anson. Costs are awarded to Collins.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

45